**Opinion issued June 5, 2014.**



In The

# Court of Appeals

For The

## First District of Texas

_____

### NO. 01-12-00666-CR

_____

### JUAN ANTONIO ZAPATA, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 179th District Court**
**Harris County, Texas**
**Trial Court Case No. 1257504**

---

### MEMORANDUM OPINION

A jury convicted Juan Antonio Zapata of capital murder and assessed

punishment at confinement for life.[1] In his sole issue on appeal, Zapata contends

that the trial court erred in overruling his motion to suppress statements he made

---

[1] *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2013) (defining capital murder and setting life confinement as possible sentence).

after he invoked his right to an attorney. We conclude that Zapata was not in custody during his interview and, therefore, did not have a right to counsel. Accordingly, we affirm.

## Background

Jose Ojeda died of a gunshot wound to the back of the head, and his body was found lying in a vacant lot. Several times on the night he died, Ojeda called Zapata. Based on cell phone records listing calls between Ojeda and Zapata's phone numbers, Harris County Sheriff Deputy Detective A. Alanis called Zapata and asked to talk to him about whether he knew what Ojeda was doing on the night he died. Zapata agreed to talk to Detective Alanis. Detective Alanis picked up Zapata at his home and Zapata rode with him in a police car to the police station. When he picked up Zapata, Detective Alanis did not have a warrant for his arrest and did not suspect Zapata was responsible for Ojeda's murder. Zapata rode in the front seat and was not handcuffed. Once they arrived at the police station, Detective Alanis told Zapata that he was free to leave.

At the police station, Zapata took a polygraph examination, during which he reported that he saw Ojeda on the night that he was murdered. After offering Zapata food, water, and an opportunity to use the restroom, Detective Alanis informed Zapata of his *Miranda* rights. Detective Alanis then invited Zapata to "give us all the information . . . an opportunity to say what happened [on the night

Ojeda died]," and Zapata began to talk. Zapata confessed that "this man pushed me and I took the gun from the other one . . . . And, well . . . that's it. I popped [motions right hand] and I got him [Ojeda]."

After Zapata admitted to shooting Ojeda, Detective Alanis did not immediately arrest Zapata. Detective Alanis knew that Zapata's first statement was contrived because his story did not match the evidence collected regarding Ojeda's death. Detective Alanis suggested that Zapata's story was false and asked him to tell the truth:

| | |
|---|---|
| ZAPATA: | All I took was the gun and that, because . . . that's the one I used. And I'm telling you . . . and I know who the other guy is. I got tired of looking for him, but I know his name and all. |
| ALANIS: | Okay. Okay. Here's the problem: the same about pushing him—. |
| ZAPATA: | Uh-huh. |
| ALANIS: | - and shooting at him, is another lie. |
| ZAPATA: | Uh-huh. |
| ALANIS: | It's not true. |
| ZAPATA: | Because— |
| ALANIS: | And I can prove it. Because in order to— |
| ZAPATA: | He was like this [motions right hand] and I just popped. |

3

Alanis then asked Zapata a series of questions, offering Zapata an opportunity to change his statement. Here, Zapata first referenced a lawyer.

| ALANIS: | Touching. It wasn't, "I pushed you and shot you." |
| --- | --- |
| ZAPATA: | Uh-huh. |
| ALANIS: | It was . . . . Bang! [touches Zapata's right knee] |
| ZAPATA: | No. I didn't hit him so close. Don't give me that. That is it! Because then—okay. Then am I getting a lawyer or not or what's the deal, or am I gonna keep on talking, just with you all . . . [motions both hands]? |
| ALANIS: | Well . . . it's your chance to tell the truth. |

While Zapata mentioned the word "lawyer," he appeared to be thinking aloud. He never stopped talking to Alanis and never requested to end the interrogation. Because Zapata did not stop talking, Alanis continued the interrogation.

Zapata made a second reference to a lawyer; however, he again continued to talk and respond to Alanis's questions.[2] Not once did Zapata ask to end the interview or to have an attorney present at the interrogation. Instead, Zapata

---

[2] Even assuming Zapata had clearly invoked his right to counsel, he did not have a right to counsel because he was not in a custodial situation. *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994) (noting that *Miranda v. Arizona*, 384 U.S. 436, 469–473, 86 S. Ct. 1602, 1625–27 (1966) provides right to counsel only in custodial situations and defendant's invocation of that right must be unambiguous or unequivocal); *see also Pecina v. State*, 361 S.W.3d 68, 78–79 (Tex. Crim. App. 2012) (same).

continued talking and eventually gave a new version of Ojeda's death, blaming another man for the murder: Zapata said that he and J. Nava planned to rob Ojeda, but Nava "went too far" and killed Ojeda.

| | |
|---|---|
| ALANIS: | This is your—your opportunity. Remember, you're talking about your life. |
| ZAPATA: | But if—if . . . Right, but I know—I know that I'm—my life is in my hands, to save myself, but . . . I need somebody to—to advise me, and that's it. I'm not just gonna run my mouth and I don't have money to pro-provide myself with a lawyer. It's better that, if you all have one, because . . . and if I'm the one who messes-up, I'm the one in trouble, right? Because I even know who has the gun and . . . and I know who has the magazines. |
| ALANIS: | Well, there it is, that's your salvation. If you didn't kill him, and you cooperate, finding who killed him, and the gun, is your salvation. But if you start saying "I don't want to say anything" [unintelligible overlapping voices]. |
| ZAPATA: | No, but the—the probl- the- no, the problem is that, if I save myself, then I will get f[—]d outside. That's the problem, that . . . not because of that. That's why I'm telling you, I lose on both side[s], here and out there. That's why. |

Detective Alanis did not arrest Zapata after the first or second statement. Instead, Detective Alanis continued the interview, arresting Zapata only after the district attorney accepted the proposed charges against him.

Before trial, Zapata moved to suppress his second statement, arguing that he had unambiguously invoked his right to counsel and Detective Alanis had unconstitutionally continued to question him. At the hearing on the motion, Alanis testified that Zapata appeared to understand the questions and willingly continued to talk after telling his first version of Ojeda's murder. Alanis also stated that Zapata was not under arrest after giving the first version of Zapata's death, but that Alanis would not have let Zapata walk out, even if Zapata had requested to do so. Alanis, however, never told Zapata that he planned to arrest him or that he was not free to leave.

The trial court denied the motion and admitted the entire transcript of Zapata's statement into evidence. A jury convicted Zapata of murder and assessed punishment at confinement for life.

Zapata timely appealed.

## Motion to Suppress

Zapata challenges the trial court's denial of his motion to suppress his second statement following his mention of the word "lawyer." He contends that he was in police custody when he made the statement admitting to the murder, that he

6

unambiguously invoked his right to counsel, and that Alanis continued the interview even though he had invoked his right to counsel. The State responds that Zapata was not in custody when he confessed, he did not invoke his right to counsel, and the trial court properly denied the motion to suppress.

## A.    Standard of review

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Ervin v. State*, 333 S.W.3d 187, 202 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). We review a trial court's denial of a motion to suppress under a bifurcated standard: we grant almost total deference to a trial court's determinations of historical facts and mixed questions of law and fact that rely on credibility and demeanor. *Id*. We review de novo all other mixed questions of law and fact that do not fall within that category. *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013); *see Ervin*, 333 S.W.3d at 202 (applying standard set forth in *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).

We give near total deference to a trial court's custody determination because it presents a mixed question of law and fact that depends upon credibility and demeanor. *Herrera v. State*, 241 S.W.3d 520, 525–27 (Tex. Crim. App. 2007); *see also Ervin*, 333 S.W.3d at 203. We defer to the trial court's determination that Detective Alanis was a credible witness. *Ervin*, 333 S.W.3d at 203. When reviewing a trial court's denial of a motion to suppress and the trial court enters no

7

fact findings, we view the evidence in the light most favorable to the trial court's ruling. *Herrera*, 241 S.W.3d at 527. We imply all necessary findings of fact that are supported by the record. *Id.* (quoting *State v. Ross,* 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)).

**B.     The trial court did not abuse its discretion in denying Zapata's motion to suppress**

The United States Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), provides that a suspect has the right to remain silent, to have an attorney present during custodial interrogation, and to be informed of these rights before any custodial interrogation. *See id*. at 478–79, 86 S. Ct. at 1630; *see Ervin*, 333 S.W.3d at 225–26. Article 38.22 of the Texas Code of Criminal Procedure statutorily incorporates those rights. TEX. CODE CRIM. PROC. ANN. art. 38.22 (West 2012).

Once a suspect is informed of his rights, he may waive his rights by speaking "freely and voluntarily without any compelling influences." *Miranda*, 384 U.S. at 478, 86 S. Ct. at 1630. If a suspect in custody exercises his right to counsel, and the police nevertheless proceed with the interrogation, any statement made by the suspect is inadmissible. *Id*. at 479, 86 S. Ct. at 1630. If the suspect is not in custody and demands counsel, law enforcement officials have no obligation to honor a request to end the questioning. *Estrada v. State*, 313 S.W.3d 274, 296 (Tex. Crim. App. 2010) (holding that police officers were not required to end

8

questioning when suspect was given premature *Miranda* warnings and had invoked right to counsel in noncustodial interrogation).

Before trial began, Zapata argued that his statement should be suppressed because he was in custody and was denied access to counsel. Detective Alanis testified that Zapata voluntarily appeared for an interview, was not in custody, and was told that he was free to leave. Both Zapata and the State questioned Alanis regarding Zapata's statement. The trial court determined that Zapata's statements were admissible. At trial, Zapata again objected to the admissibility of his statement. While we typically limit our review of a pre-trial motion to suppress to the evidence presented at that hearing, when the issue is re-litigated at trial, we review all of the presented evidence. *Ervin*, 333 S.W.3d at 203; *see also Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007). Accordingly, we consider the entire record in reviewing the trial court's ruling. *Gutierrez*, 221 S.W.3d at 687.

We first consider whether Zapata was in custody when he confessed. A person is in custody "only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citation omitted); *see also Herrera*, 241 S.W.3d at 525–26. "The construction of 'custody' is the same for both *Miranda* and article 38.22 purposes." *Richard v. State*, No. 01–11–00945–CR, 2013 WL 4676129, at *6 (Tex. App.—Houston [1st

9

Dist.] Aug. 27, 2013, no. pet.) (mem. op., not designated for publication) (citing *Herrera,* 241 S.W.3d at 526.). "The defendant bears the initial burden of proving that a statement was the product of a custodial interrogation." *Id.* (citing *Gardner v. State,* 306 S.W.3d 274, 294 (Tex. Crim. App. 2009)).

We determine custody on a case-by-case basis, only after considering all of the objective circumstances. *Dowthitt*, 931 S.W.2d at 255; *Herrera*, 241 S.W.3d at 525. Even though an interrogation may begin as noncustodial, it may later become custodial. *Dowthitt*, 931 S.W.2d at 255. Police conduct during the questioning may escalate the circumstances into a custodial interrogation. *Id.* When determining whether a custodial situation arose, we consider whether the suspect voluntarily arrived for the interrogation, the length of the interrogation, whether the suspect's requests to see relatives and friends were refused, and the degree of control exercised over the suspect. *Ervin*, 333 S.W.3d at 205. We next address each of these factors.

### 1. Voluntariness of arrival at police station

First, we consider the circumstances of Zapata's arrival at the police station. Zapata argues that he was in custody after giving his first version of Ojeda's murder because Detective Alanis testified that, after Zapata said that he shot Ojeda, "he would not have allowed him to leave." For this factor, however, our review

examines "whether the suspect arrived at the place of interrogation voluntarily." *Ervin*, 333 S.W.3d at 205. He did.

According to Detective Alanis, Zapata was the last person who saw Ojeda before his body was found. When Detective Alanis requested to ask Zapata questions about Ojeda, Zapata willingly rode with Alanis to the police station for an interview. Detective Alanis testified that he did not have a warrant for Zapata's arrest at that time and he did not make any attempt to arrest him. Detective Alanis told Zapata that he was free to leave. And Zapata was not placed under any physical restraints during the interview. The trial court could have reasonably concluded that Zapata voluntarily participated in the interrogation. *See Ervin*, 333 S.W.3d at 205–6 (holding defendant not in custody when she consented to ride with officers to station, consented to search, and officers told her that she was not under arrest and could leave at any time); *see also Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977) (holding defendant not in custody when he voluntarily went to police station, officers told him he was not under arrest, and he was free to leave). This factor favors the conclusion that Zapata was not in custody.

Zapata asks us to focus our review on whether his subsequent participation in the interrogation became involuntary. We review that question under the next three *Ervin* prongs.

11

## 2. Length of interrogation

The next factor considers the length of the interrogation. Zapata does not argue that the length of the interrogation supports a conclusion that he was in custody. *See, e.g.*, *Meek v. State*, 790 S.W.2d 618, 622 (Tex. Crim. App. 1990) (holding no custody when suspect voluntarily attended interview, was free to leave, had unsupervised access to his car, and was allowed to leave "a few hours" later); *Ervin*, 333 S.W.3d at 208–09 (holding four hours at police station does not give rise to reasonable belief of custody), *cf. Dowthitt*, 931 S.W.2d at 256–57 (holding six hours of interrogation prior to statement is important factor in determining whether custody occurred before formal arrest). The interview transcript is short: the time stamp on the transcript indicates the interview lasted less than one hour and fifteen minutes. Accordingly, the length of the interrogation does not support a conclusion that Zapata would have had a reasonable belief that he was in custody.

## 3. Access to friends or family

We next consider whether law enforcement restricted Zapata's access to friends, family, or a lawyer. *See Ervin*, 333 S.W.3d at 205. A suspect's ability to access friends and family supports a conclusion that the suspect is not in custody. *See Ervin*, 333 S.W.3d at 208–09. Zapata did not request to speak with or visit his friends or family. Nor did Alanis deny him access to his friends or family. Zapata also did not request to speak with a lawyer or to have a lawyer present during the

interrogation. Although Zapata twice mentioned the word "lawyer," he did not request and police did not deny him access to counsel. The fact that Zapata was not denied access to friends or family or a lawyer supports a conclusion that he was not in custody during the interrogation.

### 4. Degree of control exercised

Lastly, we consider the degree of control that law enforcement officers had over Zapata. Whether a law enforcement officer exercises control over a person such that it amounts to custody depends on whether "a reasonable person would have believed he could not leave freely." *Herrera*, 241 S.W.3d at 528. In *Dowthitt*, the Court of Criminal Appeals held that the law enforcement officers exercised a custodial level of control over the defendant when they accompanied him to the bathroom and ignored his complaints about headaches and his requests to see his wife. 931 S.W.2d at 256–57. Zapata does not raise similar claims, nor did he make similar requests. By contrast, Alanis, at least twice, offered Zapata food and water and the opportunity to access a restroom. During the entire time Zapata was interrogated, Alanis did not restrain or handcuff Zapata or limit Zapata's ability to leave the police station.

Zapata does not contend the police control exercised over him; accordingly, this factor also favors the conclusion that he was not in custody during the interrogation.

Having considered the four *Ervin* factors, we conclude that the facts do not, on balance, suggest that a reasonable person in Zapata's circumstances would have believed that he was under restraint to the degree associated with arrest, and, therefore, Zapata was not in custody.

## C.     Probable cause to arrest

Zapata contends that while he voluntarily appeared for the interview, it became a custodial situation after he admitted to the first version of Ojeda's murder. He argues that after he told the first version of the murder, Detective Alanis had probable cause to arrest him and that Detective Alanis would not thereafter have allowed him to leave freely. *See Dowthitt*, 931 S.W.2d at 257 (holding that once defendant admitted to being present during murders that he was in custody).

A police officer's informing the suspect of probable cause does not "automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Id*. at 255. The "'reasonable person' standard presupposes an *innocent* person." *Id*. at 254. The inquiry examines the words or actions of law enforcement officials and focuses entirely on objective circumstances. *Id*.

14

Zapata likens his circumstances to those addressed in *Ruth v. State*, in which the Court of Criminal Appeals held that when a suspect admitted to shooting the victim, explained his motive, and reenacted the offense, the interrogation became custodial because a law enforcement officer had probable cause to arrest him. *Ruth v. State*, 645 S.W.2d 432, 435 (Tex. Crim. App. 1979). The Court considered the law enforcement officer's subjective intent, the suspect's subjective belief, the investigation's focus, and whether there was probable cause for arrest. *Id*. at 436. The law enforcement officer did not give *Miranda* warnings and "inten[ded] to restrain the appellant until he made a statement." *Id*. This intention gave rise to the suspect's "subjective belief that he was required to answer [the questions]" and there was probable cause to arrest the suspect. *Id*. Based on the totality of these circumstances, the Court held that the suspect was in custody following the statement. *Id*.

The facts in this case significantly differ from those in *Ruth*. Unlike the suspect in *Ruth*, Zapata was told he could leave and that he was not in custody. In *Ruth*, the suspect believed he was required to stay and answer the officers' questions. No comparable evidence exists in this case.

Moreover, the law has changed since *Ruth*. After *Ruth*, the Court of Criminal Appeals interpreted *Stansbury* as requiring a modification of the test for determining custody. *Dowthitt*, 931 S.W.2d at 255 (citing *Stansbury v. California*,

511 U.S. 318, 114 S. Ct. 1526 (1994)). The Court of Criminal Appeals deleted two of the four inquiries used at the time of *Ruth*—the subjective beliefs of the officer and suspect—and modified the probable cause inquiry to focus on whether there was a manifestation by the officers that they had probable cause. *Id.*

Thus, the inquiry we must conduct under the probable cause basis for establishing custody is two-fold: (1) whether Detective Alanis had probable cause to arrest Zapata after he first confessed to shooting Ojeda and (2) whether a reasonable person who was innocent would have had a reasonable belief under the circumstances that he was in custody. *See Dowthitt*, 931 S.W.2d at 255; *Ervin*, 333 S.W.3d at 205; *see also State v. Rodriguez*, 986 S.W.2d 326, 329 (Tex. App.—El Paso 1999, pet. ref'd) (holding probable cause alone was insufficient to establish custody, officers must tell suspect that they have probable cause).

We assume that when Zapata first confessed to shooting Ojeda, Detective Alanis had probable cause to arrest him. *See Dowthitt*, 931 S.W.2d at 256 (noting police had probable cause to arrest suspect once he admitted that he was present during the murder); *see also Ruth*, 645 S.W.2d at 436. We turn, therefore, to the second inquiry of whether Detective Alanis "communicated or otherwise manifested" to Zapata that he had probable cause to arrest him. *Dowthitt*, 931 S.W.2d at 254.

16

Zapata argues that he was in custody because Detective Alanis testified at the hearing on the motion to suppress that "he would not have allowed him to leave" after the first time Zapata admitted to the shooting. However, "the subjective intent of law enforcement officials to arrest is irrelevant unless that intent is somehow communicated or otherwise manifested to the suspect." *Dowthitt*, 931 S.W.2d at 254; *see also Stansbury*, 511 U.S. at 324, 114 S. Ct. at 1530 (noting "one cannot expect the person under interrogation to probe the officer's innermost thoughts . . . . [A]n officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview"). There was no evidence that Detective Alanis communicated to Zapata that he had probable cause to arrest him or that Zapata could not leave. Accordingly, we conclude that Zapata's interview did not become custodial when Zapata first took responsibility for shooting Ojeda. While probable cause may have existed after Zapata's first statement, Detective Alanis never communicated that fact to Zapata. We, therefore, hold that the record supports the trial court's determination that Zapata was not in custody when he gave his second statement accounting for Ojeda's death.

Because Zapata was not in custody, he did not have a right to an attorney and Detective Alanis was not obligated to stop the interview. Therefore, we

conclude that the trial court did not abuse its discretion in denying Zapata's motion to suppress.

We overrule Zapata's sole issue.

## Conclusion

We affirm.

Harvey Brown
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).